PFITZINGER MORTUARY, INC., a Corporation, and William H. Pfitzinger,
Appellants,

v.

Homer C. DILL et al., Respondents.

No. 46712.

Supreme Court of Missouri,

Division No. 2.

Dec. 8, 1958.

Motion for Rehearing or to Transfer to Court en Banc Denied Jan. 12, 1959.

John R. Stockham, Ralph C. Kleinschmidt, St. Louis, for plaintiffs-appellants, Stockham, Roth, Buder & Martin, St. Louis, of counsel.

Harold Gruenberg, J. F. Souders, St. Louis, for defendants-respondents, Gruenberg & Schobel, St. Louis, of counsel.

BARRETT, Commissioner.

In this action for a declaratory judgment the defendants are officers and members of Embalmers' Federal Labor Union, Local 21301. The plaintiffs are Pfitzinger Mor-

tuary, Inc., and William H. Pfitzinger. As presented in this court the question for determination is the validity of one section of a proposed contract between the labor union and the plaintiff corporation, Pfitzinger Mortuary. The trial court found that the particular section of the contract concerned a lawful objective and demand on the part of the union, that the contract clause was not unlawful, that its enforcement would not infringe the plaintiffs' constitutional rights and, in general, that the contract was valid. The plaintiffs have appealed and urge that the proposed contract is contrary to Missouri public policy and, therefore, constitutes an unlawful demand, and, if permitted to become effective would deny the plaintiffs equal protection of the laws and deprive them, without due process, of their right to acquire, possess and enjoy property.

Pfitzinger Mortuary is a corporation engaged in the business of operating a funeral home in Kirkwood. William H. Pfitzinger is a funeral director and an embalmer, registered and licensed under the laws of Missouri, and he owns about seventy-five per cent of the stock of Pfitzinger Mortuary, Inc. He does not belong to the union and is not eligible for membership. During the year 1956 there was a labor union contract between Pfitzinger Mortuary, Inc., and the defendant union. As far as material here that contract provided that only licensed embalmers who were members of the union could embalm the dead. In section five, however, the 1956 contract provided that "A funeral director may perform his own embalming provided he is a licensed embalmer of the State of Missouri and owner of his establishment, proven owner of the majority of the stock of a corporation, or proven regularly designated business manager of a partnership firm * * *." Under this contract Pfitzinger Mortuary employed one licensed union embalmer, Ben E. Hoffman, one of the defendants. Also under this contract, William H. Pfitzinger, in addition to his duties as a funeral director, embalmed bodies. When the 1956 con-

tract expired the union negotiated another contract with the funeral directors' associations of St. Louis but that contract did not contain a provision permitting funeral directors who owned their establishments or majority stockholders who were licensed embalmers to embalm the dead. Pfitzinger Mortuary was not a member of either of the funeral directors' associations but the union notified the company that it could appear at a hotel and sign the contract, at the same time stating that failure to sign would place the company in violation of the agreement. Mr. Pfitzinger did not appear at the hotel but wrote a letter and informed the union that he had no objection to the contract except its omission of licensed embalmers who were majority owners of stock in corporations operating funeral homes. He also requested a conference with union representatives for the purpose of negotiating as to the omission of that clause but the union officials refused to negotiate that subject and demanded that the Pfitzinger company sign the contract. Upon the company's refusal to sign the contract their union embalmer, Ben E. Hoffman, refused to report for work and the following day the union established a picket line, the picket signs reading, "On Strike."

Subsequently there were meetings between union representatives and representatives of Pfitzinger Mortuary but the union refused to reconsider or negotiate as to the particular clause and the picket line continued. Because of the picket line the funeral car chauffeur, who belonged to another union, and two ambulance drivers, who did not belong to any union, refused to cross the picket line. Mr. Pfitzinger said that because of the picket line there was one instance in which a family directed that a deceased be removed to another funeral home When the picket line had continued for twenty days the plaintiffs, Pfitzinger Mortuary, Inc. and William H. Pfitzinger, instituted this action for a declaratory judgment in which they asked, among other things, for an injunction restraining the

union from maintaining the picket line. Before the action was tried, however, the parties entered into a stipulation in which the union agreed to and did withdraw its picket line, the plaintiffs agreed to waive any claim for monetary damages, and the plaintiff company agreed to execute the contract if and when it should be determined to be valid in the courts. Thus have the parties sought to present for determination the single question of whether the contract is legal or illegal in providing that only licensed embalmers who are members of the union may embalm the dead. But as of course the problem may not be resolved in a vacuum or abstractly, whether the contract as proposed is valid or invalid of necessity involves the consideration of several important factors and, most important of all, the facts of this particular case. Harper v. Brennan, 311 Mich. 489, 503, 18 N.W. 2d 905, 910.

At the outset, therefore, it is necessary to note certain vital factors and carefully discriminate and observe the precisely distinguishing factors and considerations applicable upon this record and appeal. In brief, the appellants seek to bring themselves within the rules by which union activities, otherwise lawful, have been enjoined or curbed when they were considered to have improperly coerced or affected the owner of a small business who conducted his business without outside help and did all or part of the work himself. Annotations 2 A.L.R.2d 1196; 13 A.L.R.2d 642; Kerkemeyer v. Midkiff, Mo., 299 S.W. 2d 409; Heath v. Motion Picture Machine Operators Union, 365 Mo. 934, 290 S.W.2d 152; Hughes v. Kansas City Motion Picture Machine Operators, 282 Mo. 304, 221 S.W. 95. William H. Pfitzinger is a licensed embalmer, he owns about 75% of the stock of Pfitzinger Mortuary, Inc., and he regularly does some of the embalming work for the mortuary. As has been said, he is not a member of the union and because he is a manager and corporate official he is neither desired nor eligible to become a member. In these circumstances it is urged that the proposed contract is contrary to Missouri public policy as declared in the Kerkemeyer, Heath and Hughes cases and, therefore, invalid.

■ The appellants contend, and it is basic in their argument, that the State of Missouri may (here by its courts), apparently without restriction, determine and declare the public policy applicable to the problems involved here. For the purposes of this opinion the entire matter involved here is an intrastate transaction but that only means that the case does not involve interstate commerce and is not governed by the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. Unlike many states Missouri does not have a state labor relations act and we are not concerned with an "unfair labor practice" on the part of either the respondents or the appellants. It is in this respect that the cases decided by the National Labor Relations Board and the National War Labor Board are not particularly helpful. Missouri does not have a so-called right-to-work law and neither does it have an anti-injunction law (a "little Norris-LaGuardia law"), nor does it have a "little Taft-Hartley law." However, the cases from states with anti-injunction laws are of some analogous force, at least in so far as they consider the problem of whether there is a "labor dispute." The constitution does contain this self-enforcing provision: "That employees shall have the right to organize and to bargain collectively through representatives of their own choosing." Const.Mo.1945, Art. 1, Sec. 29; Quinn v. Buchanan, Mo., 298 S. W.2d 413. Since there are no specifically applicable state or federal statutes and guides, other than the noted constitutional provision, the courts of necessity determine the state's public policy with respect to these matters. But the power of the state courts to declare the state's policy in these respects is nevertheless subject to certain definite restrictions and limitations, those imposed by the Fourteenth Amendment as delineated by the Supreme Court of the United States.

The Heath and Kerkemeyer cases were decided within those limitations. In this and the cases in general, when there is a conflict between a labor union and the operator of a business, "the proprietor of the business will ordinarily invoke those provisions of the Federal and state Constitutions which grant to every citizen the right to acquire, possess, and enjoy property and guarantee to him the equal protection of the law, while the union will base its right peacefully to picket on those constitutional provisions which guarantee the unrestricted right of free speech." Annotation 2 A.L.R.2d loc. cit. 1198. Thus there is not only a personal conflict between the union and the operator of the business, there is also a conflict in their respectively asserted constitutional rights and in declaring the state's public policy the court is confronted with the problem of adjusting or balancing one of these established constitutional rights against the other. In balancing the rights the state courts may not proscribe the union's activities "merely by setting artificial bounds, unreal in the light of modern circumstances, to what constitutes an industrial relationship or a labor dispute." Annotations 13 A.L.R.2d loc. cit. 643; 11 A.L.R.2d 1338.

Brief reference to three of the leading cases indicates the boundary lines, the circumstances and the substantive rule within which the appellants have sought to bring their case. In International Brotherhood of Teamsters v. Hanke, 339 U.S. 470, 70 S.Ct. 773, 775, 94 L.Ed. 995, a father and his three sons were partners in the business of repairing automobiles, dispensing gasoline and selling used automobiles. They conducted the business without outside employees. When the Hankes purchased the business it was a union shop and Mr. Hanke joined one of the unions and accordingly displayed the union shop card in the filling station window. In selling used automobiles the Hankes kept their business open nights, weekends and holidays; the unions insisted that they discontinue this practice or give up the union card. They refused to change their business hours and gave up the union card. Thereupon the unions picketed their place of business, carrying signs which said, "Union People Look for the Union Shop Card." As a result of the picketing the Hanke's business fell off heavily and drivers for supply houses refused to deliver supplies and materials. The courts of the State of Washington enjoined the picketing and on certiorari a sharply divided court indicated the state's power to balance the conflicting constitutional rights and held that the Washington decision did not unduly infringe the union's right of freedom of speech "as guaranteed by the Due Process Clause of the Fourteenth Amendment." Conversely, in Senn v. Tile Layers Protective Union, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229, a divided court held that Wisconsin's public policy, declared by a statute and as interpreted by its courts, which forced Senn to stop working with his own hands did not infringe Senn's rights to equal protection and due process under the Fourteenth Amendment even though neither Senn nor his one or two employees belonged to the union and even though Senn personally used the tools of his trade and performed much of the work commonly done by a tile layer, all in his small home-conducted business. With respect to both the state's power and the substantive rule these two cases, one in favor of the employer and the other in favor of the union, must be contrasted with Cafeteria Employees Union v. Angelos, 320 U.S. 293, 64 S.Ct. 126, 88 L.Ed. 58. There a labor union picketed a cafeteria in an effort to organize it. The cafeteria was owned by Angelos and his partners who were former owners, the partners who were not members of the union conducted the business without the aid of outside employees. The New York Court of Appeals, 289 N.Y. 498, 46 N.E.2d 903 was of the opinion that the union's representations that Angelos and his partners were "unfair" to organized labor were false and

"in broad terms" enjoined the picketing. On certiorari a unanimous court held that the injunction sanctioned by the New York court "exceeded the bounds within which the Fourteenth Amendment confines state power." [320 U.S. 293, 64 S.Ct. 127.]

Research has unearthed but a single funeral director case, Harper v. Brennan, 311 Mich. 489, 18 N.W.2d 905. In that case partners in a funeral home had no employees and did their own work as funeral directors and embalmers. Nevertheless, in 1941, the plaintiffs as members of a funeral directors' association together with "service embalmers and funeral directors" signed a union contract. When the contract term expired the partners ceased to pay dues and the union picketed their place of business and caused casket companies, undertaker service companies and others to stop doing business with them. In a most curious opinion three of the judges were of the view, since the union had organized all the units in the funeral field, that the union contract created a monopoly in violation of the state's anti-monopoly law and was therefore void. Three judges epitomized the problem in this language: "Thus in the asserted lawful exercise of their claimed respective constitutional rights, these litigants have come into conflict. But their asserted rights are relative rights, and determination of defendants' right to picket must be made in the light of the facts of this particular case, as should be done in all controversies of this type." 311 Mich. loc. cit. 502–503, 18 N.W.2d loc. cit. 910. If the partners had signed the contract its only effect as to them would have been that they would have been members of the union and obligated to pay union dues of $2 a month. This the three judges thought was not a "lawful labor objective," and therefore the picketing and coercive conduct were unlawful and should be enjoined. Two dissenting judges were of the view that the union's purpose of inducing the partners to continue their union affiliation and membership was a lawful objective,

that their peaceful picketing of the funeral home "was a lawful exercise of the right of freedom of speech guaranteed by the Federal Constitution" and therefore that the injunction suit should have been dismissed.

It will be noted in all of these cases, as well as in the Kerkemeyer, Heath and Hughes cases, that the employers were either partnerships or individual entrepreneurs, and it is sought in this action to extend the doctrine of those cases to a corporation. The appellants take the position that "the nature of the ownership is not material." They say, furthermore, that "It makes no difference whether the owner is the only person performing the work or whether the owner employs others who are members of the Union to perform some of the work." William H. Pfitzinger's license and right to pursue his work as an embalmer and funeral director have value (Dorchy v. Kansas, 272 U.S. 306, 47 S.Ct. 86, 71 L.Ed. 248) and within certain limitations and in certain circumstances are protectible rights, therefore it is said that this contract, if operative, would "deprive William H. Pfitzinger of his liberty and property without due process of law." But, of course, the fact that he is also an officer and an employee of a corporation may not be ignored, nor may the fact that the corporation also employed a union embalmer as well as other employees be brushed aside. It is not demonstrated or pointed out why or how the rule sometimes applicable to individually owned small-business concerns is likewise applicable to a corporate employer, it is merely asserted that the Heath and Kerkemeyer cases do not make the distinction and therefore declare the state's public policy.

But in the Heath case the significantly assumed fact was "that Flippin occupied a position which, for instant purposes, placed him in the same category as a bona fide partner who was entitled to the same immunity, if any, accorded to a one-man business in which the businessman-proprie-

tor performed all of his work without the assistance of employees" (365 Mo. loc. cit. 940, 290 S.W.2d loc. cit. 156). In these circumstances, in the balancing of conflicting constitutional rights to determine public policy, in addition to the relatively slight improvement to the union's economic position, the decisive factors were "the element of unfairness inherent in the proposition that the union's policy may not be satisfied by the owner-operator joining the union, the importance to our economy of encouraging the self-employer—the one-man business, and, most important, the fact that in many readily apparent situations the effect of picketing, under facts like the instant ones, may be the total elimination of the businessman-worker by reason of the fact that to replace himself as a worker may make the continuation of his business economically impossible." For that "most important" reason and in those particular circumstances, the picketing was declared to be against the state's public policy and unlawful. 365 Mo. loc. cit. 944, 290 S.W.2d loc. cit. 159. In the Kerkemeyer case the owner-operators were individual proprietors of their own barber shops, entrepreneurs, they did employ one or more union barbers, but the crux of that case, the factor determinative of public policy, was that the union's forcing proprietors to join the union would substantially impair, not their right to work with their own hands, but "those interests essential to his status as an employer in negotiations with the union concerning the terms and conditions of employment of his employees," it would in effect permit the employer to sit on both sides of the collective bargaining table and thus make a sham of the collective bargaining process. 299 S.W.2d loc. cit. 414, 417.

The appellants do not point out in this clash of rights and interests between the union and the corporation just how William H. Pfitzinger's personal or individual rights and interests may be separated from those of the corporation and separately safeguarded. In fact no such relief is asked and it is not readily apparent how in these circumstances his rights and interests could be separately and effectively protected, at the same time recognizing and protecting the union's rights and interests. In these or comparable circumstances we have been able to find but two cases involving corporations and the small-businessman rule. In Boro Park Sanitary Live Poultry Market v. Heller, 280 N.Y. 481, 21 N.E.2d 687, 688, the Boro Park Sanitary Live Poultry Market, Inc., conducted a wholesale and retail market for the sale of live and dressed poultry. Four brothers and their mother were the sole stockholders, directors and officers of the corporation. Prior to December 31, 1938, the corporation employed members of the defendant teamsters' union but on that date the contract expired and was not renewed. The stockholders and directors desired to do the work themselves; the four brothers were paid weekly wages and the mother received support from the business. By picketing and other methods the union sought to induce or compel the corporation to employ union members and to enter into a union contract on union dictated terms. The corporation sought to enjoin the picketing and the union's interference with its business. New York has an anti-injunction law but under that law the courts "excluded from the application of the statute cases where the 'owner of a small business seeks to avoid "labor disputes" as defined in the statute, by running his business without any employees'." In those circumstances the New York court was asked to "pierce" or ignore the corporate entity and because this was a small family-owned corporation to apply the rule applicable to the individual owner of a small business. The majority of the court, on general principles of corporation law, found that stockholders who worked for wages nevertheless stood in the relation of employee and employer to the corporation, that controversy as to whether stockholders or members of the union should be employed to do the work re-

mained, nonetheless, a "labor dispute" and refused to enjoin the picketing. Two dissenting judges said that, "Theoretically, the members of the family may be designated as employees of the corporation," but "Practically, under the peculiar facts in this particular case, the four brothers and the mother were the corporation and were not servants of the corporation in any sense except by legal fiction," and therefore they would have applied the small-businessman rule and would have enjoined the picketing.[1] The other corporation case, interestingly, involved as did the Heath and Hughes cases motion picture operators and their union. In that case, Warren v. Motion Picture Machine Operators, 383 Pa. 312, 118 A.2d 168, 169, the Skyline Drive-In Theatre, a corporation, owned and operated an outdoor theater. There was a union contract and the corporation employed two union operators and so there was a "labor dispute" within the meaning of Pennsylvania's labor laws. George Warren was president of the corporation and all of the stock was "owned by him and kinsmen." Donald Warren, the owner of three shares of stock, was a licensed projectionist but not a member of the union. Donald took over the post of one of the union projectionists who was then discharged. The union picketed the theater because it was employing nonunion labor, and the corporation sought to enjoin the picketing. The corporation urged that it was a closed corporation, made up of one family, and that Donald should not be treated as an employee but as a participant in the family's self-employing activities. The corporation urged that "equity should pierce the corporate veil to get at the 'actual facts'," and thus invoked the doctrine of the individual employer "who hires no employees but does his own work." In disposing of these arguments a unanimous court said, "The fact that all the stock of the corporation is owned by members of the same family does not make it any the less a corporation. Exclusive family ownership of a corporation does not necessarily mean a small or restricted enterprise. * * * The Skyline Drive-In Theatre operates as a corporation, enjoys the benefits and immunities of a corporation, and necessarily stands to accept the responsibilities of a corporation. * * * The mere fact that Donald Warren, who replaced the Union projectionist, was a stockholder and related to the other stockholders does not establish that he was working for himself."

As indicated, we are not asked here to "pierce the corporate veil," we are invited to ignore it, entirely on the theory that the case is governed by the Heath, Hughes and Kerkemeyer cases. Mr. Pfitzinger testified that he owned "about seventy-five per cent" of the stock of Pfitzinger Mortuary, Inc. It does not appear who owns the other twenty-five per cent stock interest, and, while the corporation may be a comparatively small business concern, it may not be a wholly owned family corporation. He was asked this question: "What was your total gross volume in 1956?" He answered, "Approximately $115,900.00 and some odd dollars." The company's total purchases were $39,000. The funeral home conducted between 105 and 115 funerals that year. Mr. Pfitzinger testified that he did "some of the embalming and make-

1. To illustrate the vagaries of cases if not of courts: The plaintiff failing in its corporate capacity to enjoin the picketing the Kershnar brothers and their mother, being the only stockholders, dissolved the corporation and formed a partnership, whereupon, as of course, the injunction was granted, at least until they ran afoul of the sanitary code. Kershnar v. Heller, Sup., 14 N.Y.S.2d 595; Kershnar v. Heller, 258 App.Div. 751, 15 N.Y.S.2d 451. And the principal case, Boro Park Sanitary Live Poultry Market v. Heller, brought on a rash of student notes on "piercing the corporate entity," particularly at the behest of the corporation. 20 Boston U.L.R. 132; 9 Fordham L.R. 94; 25 Cornell L.Q. 132; 9 Fordham L.R. 127; 14 St. John's L.R. 387.

**582**

up work," but it does not appear how much, if anything, he was paid for that work, nor does it appear how much, if anything, he was paid as a funeral director. It may be assumed, if he were not permitted to work as an embalmer, under the contract, that the fact would "affect your business" in some manner. However, just what proportionate part of the embalming work Mr. Pfitzinger perfromed is not known. There is no proof that Pfitzinger Mortuary could not afford to hire an additional embalmer, if one is necessary, or that the hiring of another employee is economically unsound or, as the Heath case said [365 Mo. 934, 290 S.W.2d 159], "make the continuation of his business economically impossible." On the other hand, there are 78 union embalmers, including the plaintiffs' employee, Ben E. Hoffman, and it does not appear how, if at all, Mr. Pfitzinger's working as an embalmer actually affects the union's basic policies, its economy, or the economy of any of its members.

In view of the court's limitations in declaring public policy in this field, in the absence of legislative policy and statutes governing employer-employee labor relationships, in view of the basic theory of the exempting small-businessman doctrine, and balancing, in these particular circumstances, one constitutional right against the other, it may not be said that the proposed contract is unlawful or that it improperly and unfairly infringes fundamental constitutional guaranties and is therefore contrary to the state's manifest public policy and should be enjoined. Accordingly the judgment is affirmed.

BOHLING, and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.